**CABO DISTRIBUTION CO., INC., and Black Death USA, Plaintiffs,**

v.

**Nicholas BRADY, et al., Defendants.**

No. C–92–2591 DLJ.

United States District Court, N.D. California.

July 10, 1992.

Order July 22, 1992.

---

George G. Weickhardt of Adams, Duque & Hazeltine, San Francisco, CA, for plaintiffs.

Peter Modlin, U.S. Dept. of Justice, San Francisco, CA, for defendants.

## PRELIMINARY INJUNCTION

JENSEN, District Judge.

This is an action which seeks to enjoin the decision of the United States Bureau of Alcohol, Tobacco and Firearms to revoke five

Certificates of Label Authority ("COLA's") issued to plaintiffs. Three of the COLA's were issued on July 24, 1989 and two were issued on June 8, 1992; all related to the sale of "Black Death Vodka." These COLA's were revoked by defendants on July 6, 1992. Plaintiffs claim that in doing so defendants violated their rights under the Administrative Procedure Act ("APA") and the First and Fifth Amendments to the United States Constitution.

As part of their complaint, plaintiffs moved for a preliminary injunction. The Court considered this motion in a July 10, 1992 hearing, at which George Weickhardt appeared for plaintiffs and Peter Modlin appeared for defendants.

Having considered the papers submitted and the arguments of counsel, and good cause appearing therefor, the Court GRANTS plaintiffs' motion. In considering whether to issue a preliminary injunction, the Court must consider the likelihood that plaintiff will prevail on the merits and the possible harm to the parties from granting or denying the injunctive relief. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The Court finds that plaintiffs are likely to succeed on the merits of their claim that they were denied their procedural rights under the APA and the Fifth Amendment. The Court also finds it probable that defendants' decision to revoke the COLA's was arbitrary and capricious under the APA as defendants made the decision without any new evidence.

In addition to demonstrating a likelihood of success on the merits, plaintiffs have demonstrated a threat of irreparable injury. The Court finds that a decision by defendants to revoke the COLA's would effectively put plaintiffs out of business. Moreover, based on the representations of counsel at the hearing, the Court finds it unlikely that plaintiffs will be able to recover damages. Accordingly, the balance of the equities compels the Court to enjoin revocation of the COLA's.

Accordingly, the Court ENJOINS defendants from enforcing any order cancelling or revoking the five label approvals for "Black Death Vodka" attached hereto as Exhibits A, B, C, D and E.

The reasons for the Court's order given at the hearing and in this order will be supplemented in a forthcoming opinion.

IT IS SO ORDERED.

## EXHIBIT A

JUL 06 '92  03:37PM BLACK DEATH U.S.A. (213)657-584B
FORM APPROVED OMB NO. 1512-0022 (R/V/00)

DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL

(See Instructions and Paperwork Reduction Act Notice on Back)

### PART I – APPLICATION

**FOR ATF USE ONLY**

ID ___ 06 92-1202 ___
CT 351 | 65

1. VENDOR CODE (Required)  **1240**
2. SERIAL NO (Required)  **92-13**
6. BRAND NAME (Required)  **BLACK DEATH**
8. CLASS AND TYPE (Required)  **VODKA  1.0 LITER**
7. FANCIFUL NAME (If Any)
8. VINTAGE (Wine Only)
9. AGE (Distilled SPIRITS)
10. FORMULA NO (If Any)
11. LAB ANALYSIS NO
12. STATE ANY WORDING, NOT SHOWN ON LABELS (Caps, closures, etc.)

3. NAME AND ADDRESS AND PLANT REGISTRY NO. OR BASIC PERMIT NO. OF APPLICANT

CABO DISTRIBUTING COMPANY, INC.
9657 E. RUSH ST.
SO. EL MONTE   CA   91733

CA-1-1979

4. TYPE OF APPLICATION (Check Applicable Box)

a. ☒ CERTIFICATE OF LABEL APPROVAL
b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL · FOR SALE IN _____ ONLY ·
(Fill In State abbreviation)
c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL
TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (Fill In amount)

### PART II – APPLICANT'S CERTIFICATION

The applicant hereby declares under the penalties of perjury that to the best of his/her knowledge and belief all statements appearing in the above application are true and correct and the representations of the labels and in the supplemental documents truly and correctly represent the contents of the containers to which such labels will be applied. Additionally, the applicant for exemption from label approval further certifies that the product will be exclusively disposed of in the State shown in item 4b, and that each container will bear the legend "For Sale in (State shown in Item 4b.) only"

13. DATE OF APPLICATION  **6-8-92**
14. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT

### PART III – ATF CERTIFICATE

This certificate is issued subject to applicable laws and regulations and conditions as set forth on the back of this form.

15. DATE ISSUED  **JUN 0 8 1992**
16. SIGNATURE OF DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS  *Stephen E. Higgins*

### FOR ATF USE ONLY

QUALIFICATIONS  Product to be released from Newark, NJ port ONLY not to exceed the number of cases indicated below.

TERMINATION DATE (If Any)  SEP 11 1992

This certificate is operative for the release of not more than __2,000__ cases.

ATF · 5100.31 (10-80) REPLACES ATF FORMS 1649, 1649 AND 1490 WHICH ARE OBSOLETE

586

## EXHIBIT B

P. 1

FORM APPROVED OMB NO 1512-0092 (2/20/00)

DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL
(See Instructions and Paperwork Reduction Act Notice on Back)

**PART I – APPLICATION**

**FOR ATF USE ONLY**

3 NAME AND ADDRESS AND PLANT REGISTRY NO. OR BASIC PERMIT NO. OF APPLICANT

06-92 1201

351 OR 65 AP

1. VENDOR CODE (Required)
2. SERIAL NO. (Required)

1240

92-14

BRAND NAME (Required)

CABO DISTRIBUTING COMPANY, INC.
9657 E. RUSH ST.
SO. EL MONTE, CA 91733

CA-1-1979

BLACK DEATH

CLASS AND TYPE (Required)

VODKA 750 ML

FANCIFUL NAME (If Any)

4. TYPE OF APPLICATION (Check Applicable Box)

a. ☒ CERTIFICATE OF LABEL APPROVAL

VINTAGE (Wine Only) | 9. AGE (Distilled SPIRITS)

b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL "FOR SALE IN ____ ONLY" (Fill in State abbreviation)

FORMULA NO (If Any) | 11. LAB. ANALYSIS NO

c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL
TOTAL BOTTLE CAPACITY BEFORE CLOSURE ____ (Fill in amount)

STATE ANY WORDING, NOT SHOWN ON LABELS (Caps, colonels etc.)

**PART II – APPLICANT'S CERTIFICATION**

The applicant hereby declares under the penalties of perjury that to the best of his/her knowledge and belief all statements appearing in the above application are true and correct and the representations of the labels and in the supplemental documents truly and correctly represent the contents of the containers to which such labels will be applied. Additionally, the applicant for exemption from label approval further certifies that the product will be exclusively disposed of in the State shown in item 4b, and that each container will bear the legend "For Sale in (State shown in item 4b.) only".

DATE OF APPLICATION

6-8-1992

14. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT

**PART III – ATF CERTIFICATE**

This certificate is issued subject to applicable laws and regulations and conditions as set forth on the back of this form.

DATE ISSUED

JUN 0 8 1992

16. SIGNATURE OF DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

Stephen E. Higgins

**FOR ATF USE ONLY**

QUALIFICATIONS product to be released from Neward, NJ but only + not to exceed the number of cases indicated below.

This certificate is operative for the release of not more than 6,000 cases.

TERMINATION DATE (If Any)

SEP 11 1992

ATF F 5100.31 (10-85) REPLACES ATF FORMS 1649, 1649 AND 1650 WHICH ARE OBSOLETE

## EXHIBIT C

DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL

(See Instructions and Paperwork Reduction Act Notice on Back)

**PART I – APPLICATION**

| FOR ATF USE ONLY | |
|---|---|
| ID | 0 0 0 7 7 |
| CT | 301 · OR · AP |

3. NAME AND ADDRESS AND PLANT REGISTRY NO. OR BASIC PERMIT NO. OF APPLICANT

CA 1 1979

CABO DISTRIBUTING CO., INC.
9657 E. RUSH ST.
SO. EL MONTE, CA 91733

| 1 VENDOR CODE (Required) | 2 SERIAL NO (Required) |
|---|---|
| 1240 | 820 |

5 BRAND NAME (Required)
BLACK DEATH

6 CLASS AND TYPE (Required)
VODKA 1.0 LITER

7 FANCIFUL NAME (If Any)

| 8 VINTAGE (Wine Only) | 9 AGE (Distilled Spirits) |
|---|---|

4 TYPE OF APPLICATION (Check Applicable Box)

a. ☒ CERTIFICATE OF LABEL APPROVAL

b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL FOR SALE IN _____ ONLY (If in State abbreviation)

| 10 FORMULA NO (If Any) | 11 LAB ANALYSIS NO |
|---|---|
| | 1890801 |

c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____

12 STATE ANY WORDING NOT SHOWN ON LABELS (Caps, Crowns, etc.)

**PART II – APPLICANT'S CERTIFICATION**

The applicant hereby declares under the penalties of perjury that to the best of his/her knowledge and belief all statements appearing in the above application are true and correct and the representations on the labels and in the supplemental documents truly and correctly represent the contents of the containers to which such labels will be applied. Additionally, the applicant for exemption from label approval further certifies that the product will be exclusively disposed of in the State shown in item 4b, and that each container will bear the legend "For Sale in (State shown in item 4b,) only".

| 13 DATE OF APPLICATION | 14 SIGNATURE OF APPLICANT OR AUTHORIZED AGENT |
|---|---|
| 7-20-89 | |

**PART III – ATF CERTIFICATE**

This certificate is issued subject to applicable laws and regulations and conditions as set forth on the back of this form

| 15 DATE ISSUED | 16 SIGNATURE OF DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS |
|---|---|
| JUL 2 4 1989 | |

**FOR ATF USE ONLY**

QUALIFICATIONS: Government Warning must appear in 2 mm size type.

TERMINATION DATE (If Any)

Black Death
VODKA
Distilled and Bottled under supervision of the SICURDSON FAMILY
Not genuine without my signature
40% alc/vol
Serve Ice Cold
100% Beet Neutral Spirits

Black Death
VODKA
SCREWBANGER
1/2 measure BLACK DEATH VODKA
1/2 measure Galliano
1 measure Orange juice
Serve over ice
1 LITER        40% alc/vol
PRODUCED AND BOTTLED IN BELGIUM FOR BLACK DEATH S.A. L-1018 LUXEMBOURG
IMPORTED BY: CABO DISTRIBUTING COMPANY, INC.
0 81280 61123
Don't drink and drive

## EXHIBIT D

FORM APPROVED OMB NO 1512-0492 (10/31/)

**DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**

## APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL

(See Instructions and Paperwork Reduction Act Notice on Back)

### PART I – APPLICATION

**FOR ATF USE ONLY**

0 0 0 9 7 3

C1 301

3 NAME AND ADDRESS AND PLANT REGISTRY NO OR BASIC PERMIT NO OF APPLICANT

3 9 6 2
CA 1 1979

CABO DISTRIBUTING CO., INC.
9657 E. RUSH ST.
SO. EL MONTE, CA 91733

| 1 VENDOR CODE (Required) | 2 SERIAL NO (Required) |
|---|---|
| 1240 | 821 |

5 BRAND NAME (Required)
BLACK DEATH

6 CLASS AND TYPE (Required)
VODKA    750 ML

7 FANCIFUL NAME (If Any)

8 VINTAGE (Wine Only)     9 AGE (Distilled Spirits)

4 TYPE OF APPLICATION (Check Appropriate Box)

- a ☑ CERTIFICATE OF LABEL APPROVAL
- b ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL  FOR SALE IN _____ ONLY (If in State abbreviation)
- c ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL  TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (If in amount)

10 FORMULA NO (If Any)     11 LAB ANALYSIS NO
1890801

12 STATE ANY WORDING NOT SHOWN ON LABELS (Caps, Closures, etc)

### PART II – APPLICANT'S CERTIFICATION

The applicant hereby declares under the penalties of perjury that to the best of his/her knowledge and belief all statements appearing in the above application are true and correct and the representations of the labels and in the supplemental documents truly and correctly represent the contents of the containers to which such labels will be applied Additionally the applicant for exemption from label approval further certifies that the product will be exclusively disposed of in the State shown in item 4b and that each container will bear the legend "For Sale in (State shown in item 4b) only".

13 DATE OF APPLICATION
7-20-89

14 SIGNATURE OF APPLICANT OR AUTHORIZED AGENT

### PART III – ATF CERTIFICATE

This certificate is issued subject to applicable laws and regulations and conditions as set forth on the back of this form.

15 DATE ISSUED
JUL 2 4 1989

16 SIGNATURE OF DIRECTOR, BUREAU OF ALCOHOL TOBACCO AND FIREARMS

**FOR ATF USE ONLY**

QUALIFICATIONS  Government Warning must appear in 2mm size type.

TERMINATION DATE (If Any)

Distilled and Bottled under supervision of the SIGURDSON FAMILY
Not genuine without my signature
750 ml  40% alc/vol
Serve Ice Cold
100% Beet Neutral Spirits

SKULLBANGER
1/2 measure BLACK DEATH VODKA
1/2 measure Galliano
One Measure Orange juice
Serve over ice

750 ml  40% alc/vol

2MM size type

PRODUCED AND BOTTLED IN BELGIUM FOR BLACK DEATH S.A.
L-1016 LUXEMBOURG

IMPORTED BY
CABO DISTRIBUTING COMPANY, INC.

0  61240 61133

Don't drink and drive

ATF F 5100 31 (10 85)  REPLACES ATF FORMS 1648 1649 AND 1650 WHICH ARE OBSOLETE

## EXHIBIT E

FORM APPROVED OMB NO 1512-0012 (10/31/86)

### DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
### APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL
(See Instructions and Paperwork Reduction Act Notice on Back)

#### PART I – APPLICATION

FOR ATF USE ONLY  0-0-

3 NAME AND ADDRESS AND PLANT REGISTRY NO OR BASIC PERMIT NO OF APPLICANT

CA I 1979 3 7 6 3

301   OR   AP

CABO DISTRIBUTING CO., INC.
9657 E. RUSH ST.
SO. EL MONTE, CA 91733

1 VENDOR CODE (Required) 1240
2 SERIAL NO (Required) 822

5 BRAND NAME  BLACK DEATH

6 CLASS AND TYPE (Required)  VODKA   50 ML.

7 FANCIFUL NAME (If Any)

8 VINTAGE (Wine Only)

9 AGE (Distilled SPIRITS)

10 FORMULA NO (If Any)

11 LAB ANALYSIS NO  1890801

4 TYPE OF APPLICATION (Check Appropriate Box)
- a ☑ CERTIFICATE OF LABEL APPROVAL
- b ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL  FOR SALE IN _____ ONLY (If in State abbreviation)
- c ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL  TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (If in amount)

12 STATE ANY WORDING NOT SHOWN ON LABELS (Caps embossing, etc)

#### PART II – APPLICANT'S CERTIFICATION

The applicant hereby declares under the penalties of perjury that to the best of his/her knowledge and belief all statements appearing in the above application are true and correct and the representations of the labels and in the supplemental documents truly and correctly represent the contents of the containers to which such labels will be applied. Additionally, the applicant for exemption from label approval further certifies that the product will be exclusively disposed of in the State shown in item 4b and that each container will bear the legend "For Sale in (State shown in item 4b.) only".

13 DATE OF APPLICATION  7-20-89

14 SIGNATURE OF APPLICANT OR AUTHORIZED AGENT

#### PART III – ATF CERTIFICATE

This certificate is issued subject to applicable laws and regulations and conditions as set forth on the back of this form

15 DATE ISSUED  JUL 2 4 1989

16 SIGNATURE OF DIRECTOR BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

#### FOR ATF USE ONLY

QUALIFICATIONS  *When label is reduced Government warning must remain in not smaller than 1mm size type.*

TERMINATION DATE (If Any)

AFFIX COMPLETE SET OF LABELS BELOW

*Labels will be reduced to fit 50ml size bottles*

ATF F 5100.31 (10.85) REPLACES ATF FORMS 1649, 1650 AND 4150 WHICH ARE OBSOLETE

## ORDER

JENSEN, District Judge.

On July 10, 1992, the Court issued a preliminary injunction in this case in the form of a brief written order. The Court now issues this opinion to more fully explain the basis for the preliminary injunction.

## BACKGROUND

This is an action over the right to sell vodka in the United States under the "Black Death Vodka" label. Plaintiff Black Death USA is a California corporation which owns all rights to "Black Death Vodka," and plaintiff Cabo Distributing Company, Inc. ("Cabo") is a California corporation which imports and distributes the vodka. *See* Declaration of Federico Cabo, ¶¶ 1, 3 [hereinafter "Cabo Declaration"]. Defendants are the United States Department of the Treasury, the Bureau of Alcohol, Tobacco and Firearms ("BATF" or "Bureau"), and several officials of those agencies.

### A. Development of "Black Death Vodka"

"Black Death Vodka" is an 81% proof vodka made from beet neutral spirits. *See* Letter from Jerry Bowerman to Ann Morse, dated July 24, 1989 (Exhibit A to Cabo Declaration) (describing the vodka's chemical composition). This vodka was originally made by the Sigurdsson family of Iceland in the early 1900's. *See* Cabo Declaration, ¶ 5. The name "Black Death" apparently is a translation of a colloquial name for vodka used in Iceland and Scandinavia and does not refer to the plague which ravaged Europe from 1347 into the Nineteenth Century.[1] *Id.* ¶¶ 5-6. According to one of the declarations submitted to the Court, the name developed during Iceland's prohibition era. When people would drink excessive quantities of boot-

leg vodka, they would sometimes fall in the street and lay there in a drunken stupor. Remaining there for hours or days, these persons would appear to be dead to passersby. The name "black death" was used to describe the bootleg distilled spirits which caused this condition. *See* Declaration of Terry Cates, ¶ 10 [hereinafter "Cates Declaration"] (recounting explanation told to him by Thomas Lines of Black Death USA).

The Sigurdsson family recipe emerged from the shadows of Icelandic anonymity in 1975 when Valgier Tomas Sigurdsson moved to Europe. Cabo Declaration, ¶ 6. There, he began to produce "Black Death Schnapps" in 1985 and "Black Death Vodka" in 1986.[2] *Id.* Winning several international awards for quality, Sigurdsson was selling "Black Death Vodka" in over forty countries within a few years. *Id.* ¶¶ 6-7. In every country where it is sold, the "Black Death" label is used. *Id.* ¶ 7.

In 1989, Cabo acquired the right to import "Black Death Vodka" into the United States. *Id.* ¶ 8. Pursuant to federal law, Cabo applied to the BATF for approval of the label. Three applications were submitted to the BATF: one for labels on single liter bottles, one for labels on 750 milliliter bottles, and one for labels on 50 milliliter bottles. *See id.;* Applications for and Certification/Exemption of Label/Bottle Approval ("COLA's"), submitted July 20, 1989 (Exhibits B–D to Cabo Declaration). After reviewing these applications, the BATF approved the "Black Death" labels on June 24, 1989.[3] *Id.*

All of the labels are substantially the same. On the front of the bottle, the words "Black Death Vodka" appear in large type around a grinning skull wearing a top hat.[4] On the

---

1. Strictly speaking, the term "Black Death" does not refer solely to the bubonic plague. Two closely related diseases, pneumonic plague and septicemic plague, were also responsible for the widespread mortality which occurred during the Black Death.

2. "Black Death Vodka" is produced and bottled in Belgium by Bruggeman NV. *See* Cabo Declaration, ¶ 2.

3. In 1990, BATF approved a similar label for "Black Death Vodka" imported by Blair Importers of Lake Success, New York. *See* Cabo Declaration, ¶ 10; Application for and Certification/Exemption of Label/Bottle Approval, submitted August 15, 1990 (Exhibit F to Cabo Declaration).

4. The owner of Cabo Distributing Co., Federico Cabo, provides his own aesthetic impression of the front label for the Court. He states that "[t]he skull appearing on the front of the bottle is

rear of the bottle, there is a mandatory government warning regarding the dangers of alcohol consumption and the statement "Don't Drink and Drive." *See id.*

Once the labels were approved, Cabo Distributing Co. began to promote and market the vodka in the United States. Between July 1, 1989 and April 1, 1992, Cabo spent over $1 million promoting and marketing the vodka.[5] *Id.* ¶¶ 11–12. In this promotional campaign, Cabo apparently targeted young alcohol drinkers by using such techniques as selling bottles in miniature coffins and promoting the vodka with slogans such as "Drink in Peace." *See* Letter from United States Surgeon General Antonio Novello to William Earle at BATF, dated July 2, 1992 (attached to Exhibit G to Declaration of George G. Weickhardt); Wall Street J., Apr. 3, 1992, at B1 ("Lines [at Black Death USA] agrees that the vodka has a youthful target market"). In addition, Cabo hired Saul Hudson, also known as "Slash" in his role as the lead guitarist of the musical ensemble "Guns 'n Roses," to promote "Black Death Vodka." *See* Cabo Declaration, ¶ 12. These marketing efforts were successful, and by the beginning of 1992, the spirits were being distributed by Cabo in California, Illinois, Pennsylvania, Maryland, Florida, New Jersey, and New Mexico.[6] *See* Cabo Declaration, ¶ 11.

On April 1, 1992, plaintiff Black Death USA was incorporated for the purpose of purchasing the rights to "Black Death Vodka" from V.T. Sigurdsson. Sigurdsson agreed to sell the rights to the vodka for approximately $3.3 million, of which $550,000 in cash was paid in April and $2.75 million was guaranteed in royalties. *See* Cabo Declaration, ¶ 12. Although a copy of the agreement has not been submitted to the Court, plaintiffs assert that the royalty payments are guaranteed regardless of how much vodka is sold. *Id.* Plaintiffs assert that this purchasing decision, as well as the money invested in the advertising campaign, was made in reliance on the BATF's approval of the "Black Death" labels. *Id.* ¶ 11.

*B. Revocation of the "Black Death" Label*

In early 1992, plaintiffs' advertising campaign began to lead members of the health care community to believe that "Black Death Vodka" was improperly encouraging alcohol abuse on the part of young people. Among others, the United States Surgeon General, Antonia Novello, made statements on the "Today Show" in which she criticized plaintiffs' decision to market the vodka to young people. *See* Wall Street J., Apr. 3, 1992, at B1 (Exhibit J to Cabo Declaration). Sometime following the initiation of the advertising campaign and the criticism of "Black Death Vodka," the BATF decided to reexamine its approval of the label. *See* Cates Declaration, ¶ 12 ("... while we were looking at the label in and of itself, we were aware of the publicity surrounding the product, and this may have played a role in our decision to take a second look at the label."). Terry Cates, who is Chief of the Industry Compliance Division of the Bureau, was quoted in the *Wall Street Journal* as stating that "[h]ad we known the direction of the point-of-sale advertising was going to take, I submit we wouldn't have approved [the label]."[7] Wall Street J., Apr. 3, 1992, at B3.

On April 1, 1992, Terry Cates sent a letter to Federico Cabo regarding the label. The letter stated that the BATF had "reexamined

---

not a symbol for poison, which is a skull and cross-bones. Instead, it is quite a distinctive, smiling, genial skull with a top hat." Cabo Declaration, ¶ 9. In contrast, journalists and others describe the skull as a "macabre image[.]" *See* Montreal Gazette, May 17, 1992, at B5 (attached to BATF Final Decision, dated July 6, 1992 (Exhibit G to Declaration of George Weickhardt)).

5. Federico Cabo also states that he and his employees invested "thousands of hours ... of highly valuable personal time" in this effort. Cabo Declaration, ¶ 12. He does not attempt to quantify the value of their time.

6. There also may have been attempts to distribute the vodka in Massachusetts and Texas. According to defendants, both of those states have specifically refused to allow plaintiffs to sell the vodka under the "Black Death" label. *See* Cates Declaration, ¶ 12.

7. Cates does not deny making this statement. *See* Cates Declaration, ¶ 11 (discussing the statement but not disclaiming it).

the matter" and decided that the labels were in violation of Bureau regulations. Plaintiffs were given ten days to stop selling vodka under the "Black Death" label, although plaintiffs were also told that they would be permitted to submit written and oral comments to the Bureau.

Cates stated that the labels violated the regulations in two ways. First, he stated that the reference to the Black Death, which was "a plague which killed millions of people," combined with the skull image, created an impression "that the product is inherently unsafe for human consumption at any level." *See* Letter from Terry Cates to Federico Cabo, dated Apr. 1, 1992, at 2 (Exhibit G to Cabo Declaration) [hereinafter "April 1 Letter"].

Second, Cates stated that the label "mocks the real health risks which may result from the consumption of alcohol by making an obviously false claim about the dangers of alcohol consumption." *Id.* This parody had the "overall effect" of undermining the effect of the Surgeon General's warning on the label of the vodka. *Id.*

The Bureau stated that its decision to revoke approval of the label was based on its authority pursuant to the Federal Alcohol Administration Act ("FAA Act"), 27 U.S.C. § 205(e). This statute authorizes the BATF to promulgate regulations of alcoholic beverage labels which will "prohibit deception of the consumer." The BATF's regulations require the Bureau to reject labels which "convey[ ] erroneous impressions as to the age, origin, identity, or other characteristics of the product." 27 C.F.R. § 5.34(a).

Plaintiffs arranged to meet with the government regulators in Washington, D.C. on April 7, 1992. At this meeting, plaintiffs were represented by Federico Cabo, Thomas Lines, and James Cooper, who are all shareholders and directors of Black Death USA, and George Weickhardt, their attorney. The Bureau was represented by Terry Cates, John J. Manfreda, who is the Associate General Counsel of the BATF, defendant Candace Moberly, who is the Chief of the Bureau's Product Compliance Branch, and others.

In their discussion of the April 1 letter, the Bureau officials stood by their reasoning that the "Black Death" label was misleading. They stated that they had made this decision without reference to any consumer survey, but rather on the basis of their administrative expertise in determining whether a label is misleading on its face. *See* Cates Declaration, ¶¶ 8–9; Cabo Declaration, ¶ 16. Plaintiffs stated that they believed the Bureau was not justified in revoking approval of the labels and that they wanted more time to respond to the letter. Cates Declaration, ¶ 7. The Bureau agreed to postpone their revocation of the labels until June 11, 1992 in order to give plaintiffs time "to provide written arguments and evidence to show that the [label approvals] should not be cancelled"; this extension was confirmed in an April 8 letter. *See id.* ¶ 13; Letter from Terry Cates to Federico Cabo, dated April 8, 1992 (Exhibit J to Cabo Declaration).

The parties met a second time on April 30 to discuss revocation of the label approval. At this meeting, plaintiffs were represented by Cabo and Lines and the Bureau was represented by Cates, Moberly, and a Bureau staff attorney. According to the Bureau, plaintiffs approached this meeting with an eye to negotiating a settlement of the dispute rather than setting up litigation. *See* Cates Declaration, ¶ 14 ("At the outset of this meeting, Mr. Lines noted that they had not brought their counsel to this meeting, and that they hoped that this matter could be resolved without resorting to expensive and time-consuming litigation."); *see also* Cabo Declaration, ¶¶ 18–19 (outlining suggested compromises offered by plaintiffs).

Plaintiffs offered to do three things to correct any misconceptions created by the "Black Death" label. First, they offered to put a qualifying statement on the back of the bottles explaining that "Black Death Vodka" was not associated with the bubonic plague and which would encourage consumers not to drink and drive. *See* Cabo Declaration, ¶ 18; Exhibit K to Cabo Declaration (text of proposed statement). Second, they offered to include a warning against alcohol abuse and underage drinking in future advertising. *See* Cabo Declaration, ¶ 19; Exhibit L to Cabo

Declaration (text of proposed statement). Third, they offered to distribute copies of "Black Death's Survival Guide" to "social hosts and hospitality professionals." This pamphlet would provide information about the health effects of alcohol abuse and make suggestions about how to identify underage drinkers. *See* Cabo Declaration, ¶ 19; Exhibit M to Cabo Declaration (draft of the pamphlet).

The Bureau officials rejected these offers. According to Cates, plaintiffs were told that such efforts would be laudable in and of themselves but would be insufficient to overcome the negative impressions created by the label. *See* Cates Declaration, ¶ 15. The Bureau claims that its decision was not yet final at this point, however, and that they would continue to consider offers from plaintiffs. *Id.* ¶ 16. A temporary license was issued by the Bureau in order to permit plaintiffs to sell off existing stocks of vodka bottled under the "Black Death" label; plaintiffs were given until September 11, 1992 to do so. *See* Cabo Declaration, ¶¶ 20, 24; Exhibits S–T to Cabo Declaration (temporary permits); Declaration of Candace Moberly, ¶¶ 16–19 [hereinafter "Moberly Declaration"].

Plaintiffs present a different account of this meeting. They state that Cates rejected these offers out of hand, and told them that "Whatever you say doesn't make any difference to me. Your label is dead. I have already decided to cancel it." *See* Cabo Declaration, ¶ 20. Plaintiffs also claim that Cates told them that the Bureau had already made its final decision on the labels and that further papers would be futile. *Id.* Cates allegedly also backed off the Bureau's claim that consumers would believe that the vodka was associated with the bubonic plague, and stated that the Bureau's problem with the label focused around the word "death." *Id.* at 20, 23.

Once the Bureau had rejected the offer of corrective labeling and advertising, the parties began to discuss alternative names for the product. *See* Cates Declaration, ¶ 17 (stating that plaintiffs "expressed willingness to consider changing the brand name"); Moberly Declaration, ¶ 7 (same). Plaintiffs stress in their papers that they only began to suggest alternative names when it became clear that the BATF would not permit them to continue using the name "Black Death Vodka." *See* Second Declaration of Thomas Lines, ¶ 6 [hereinafter "Second Lines Declaration"]. Plaintiffs suggested that the name "Black Hat" could be used. *See* Moberly Declaration, ¶ 7. When the Bureau received applications for labels under that name on May 7, 1992, they were approved the next day. Moberly Declaration, ¶¶ 9–10; Applications for and Certification/Exemption of Label/Bottle Approval, dated May 8, 1992 (Exhibits P–Q to Cabo Declaration).

Plaintiffs claim that this entire process violated their rights to procedural due process. They claim that the BATF made its decision without receiving any input from them, before both the April 1 letter and the April 30 meeting. This early regulatory decision came in spite of the fact that plaintiffs claim that they never waived any of their rights to the name "Black Death." *See* Cabo Declaration, ¶ 23; Second Lines Declaration, ¶ 6.

The Bureau apparently believed, on the other hand, that the parties had settled the dispute in the April 30, 1992 meeting. This is reflected in statements by Candace Moberly, *see* Moberly Declaration, ¶¶ 11, 13, the expedited approval of the "Black Hat" label, *see id.* ¶¶ 8–11, and plaintiffs' failure to actually submit anything in writing contesting the cancellation of the label prior to June 11, 1992.[8] On June 17, 1992, the BATF formally notified plaintiffs that the 1989 "Black Death Vodka" label approvals had been cancelled.[9] *See* Letter from Candace Moberly to Federi-

---

8. Although the Bureau claims that plaintiffs had agreed to settle this matter, counsel does not go so far as to say that such an oral agreement would be binding on the Bureau. Accordingly, this settlement argument does not constitute an affirmative defense to plaintiffs' claims in this action.

9. In addition, the Bureau announced for the first time that the 1992 certificates of label approval for the remaining stock of "Black Death Vodka" had been revoked as well.

co Cabo, dated June 17, 1992 (Exhibit W to Cabo Declaration).

Sometime in June, plaintiffs began to have second thoughts about their situation. Although they had received approval for "Black Hat," plaintiffs came to the conclusion that they needed to continue to use the "Black Death" label. First, plaintiffs concluded that consumers would be unable to identify the new vodka as being the same vodka sold under the "Black Death" label. Cabo Declaration, ¶ 31. There is an assertion in one of the declarations that the BATF would not permit the new "Black Hat" labels to state that the product was formerly sold under the "Black Death" label. *Id.* Second, plaintiffs claim that V.T. Sigurdsson refused to put his name on any bottles without the name "Black Death." *Id.* It is not clear how this would harm plaintiffs, as it is the Court's impression that Black Death USA now owns all of the rights to use of the brand name. Third, plaintiffs assert that· under the purchase agreement in which they acquired the "Black Death" name from Sigurdsson, they are required to only sell the vodka under the name "Black Death." *Id.* ¶ 32. They do not attach the purchase agreement, however, and there is no indication that they ever attempted to modify the agreement. Finally, "Slash" refused to endorse any products sold under the "Black Hat" label; he told plaintiffs that he would only endorse vodka sold under the "Black Death" label.[10]

Whatever the reason, plaintiffs petitioned the BATF for reconsideration of their decision in June. *See* Letter from George Weickhardt to Candace Moberly, dated June 23, 1992 (Exhibit H to Cabo Declaration). The Bureau refused and issued a "final decision" on July 6, 1992. *See* Letter from Daniel Black to George Weickhardt, dated July 6, 1992 (Exhibit G to Weickhardt Declaration) [hereinafter "BATF Final Decision"]. When plaintiffs received this document on July 7, they filed this lawsuit.

This action states two claims against defendants. First, it claims that defendants violated their rights under the Administrative Procedure Act ("APA") and the United States Constitution by revoking the label certificate without cause. Second, there is a *Bivens* claim against Cates and Moberly based on an alleged violation of the First and Fifth Amendments.· Plaintiffs seek injunctive relief and damages.

### ANALYSIS

*A. Legal Standard*

█ The Court has the authority to grant a preliminary injunction in the exercise of its equitable powers. Fed.R.Civ.P. 65. As the Court is acting in equity, the decision to enter a preliminary injunction is largely left to its discretion. *See Big Country Foods, Inc. v. Board of Education of Anchorage School District,* 868 F.2d 1085, 1087 (9th Cir.1989). Traditionally, this rule has been interpreted to require the trial court to consider the likelihood that plaintiff will prevail on the merits *and* the possible harm to the parties from granting or denying the injunctive relief. *See Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987); *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984). At the extremes, the party seeking injunctive relief must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, *or* (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448 (9th Cir. 1988); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.' " *Miss World,* 856 F.2d at 1448 (quoting *Rodeo Collection,* 812 F.2d at 1217). However, in any situation, the Court must

---

**10.** Another reason for the reassessment may be the fact that "Black Death Vodka" sales have begun to skyrocket. Due to the publicity surrounding the decision of the BATF in this case, "Black Death Vodka" sales have apparently taken off, and Cabo now seeks nationwide distribution of the vodka and the introduction of "Black Death Tequila," which would feature a smiling skull wearing a sombrero. *See* Montreal Gazette, May 17, 1992, at B5; London Guardian, May 13, 1992 (both attached to BATF Final Decision (Exhibit G to Weickhardt Declaration)).

find that there is some threat of an immediate irreparable injury, even if that injury is not of great magnitude. *Big Country*, 868 F.2d at 1088 (citing cases); *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985) (citing cases).

### B. Analysis

1. Likelihood of Success on the Merits

This Court is given authority to overturn an agency decision by the APA. Under the APA, agency decisions may be "h[e]ld unlawful and set aside" if they are

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C.A. § 706(2) (West 1977). Plaintiffs' likelihood of success on the merits thus turns on whether the BATF's actions fall into any of these categories. This analysis will proceed accordingly.

### a. Arbitrary or Capricious Agency Action

■ Judicial review under the "arbitrary or capricious" standard is narrow in scope, and does not involve the substitution of the Court's judgment for that of the Bureau. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Instead, the Court must look to see whether the Bureau articulated reasons for its decision, whether those reasons were based on relevant factors, and whether the Bureau's decision had some rational basis.[11] *Id.* at 42–45, 103 S.Ct. at 2866–67 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–70, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)); *Thompson v. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir.1989).

■ In this case, the Bureau did articulate reasons for its decision to revoke plaintiffs' certificates of label approval. *See* April 1 Letter; BATF Final Decision. These reasons were, first, that the label would lead consumers to falsely believe that the vodka was inherently dangerous, and second, that by mocking the dangers of alcohol, consumers would be mislead into believing that alcohol is not dangerous. This articulation permits the Court to review the reasoning behind the Bureau's decision to determine whether it was based on legally irrelevant factors or lacked a rational basis.

The FAA Act is the basis of the BATF's authority to regulate labels of distilled spirits. It provides in relevant part that

It shall be unlawful for any person ... to sell ... any distilled spirits ... unless such products are ... labeled in conformity with such regulations, to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and labeling and size and fill of containers ... as will prohibit deception of the consumer with respect to the products or quantity thereof and as will prohibit, irrespective of falsity, such statements relating to age, manufacturing processes, analyses, guarantees, and scientific or irrelevant matters as the Secretary of the Treasury finds to be likely to mislead the consumer....

27 U.S.C.A. § 205(e) (West 1927 & Supp. 1992). Passed in 1935, this statute was intended to prohibit practices in the alcoholic beverages industry "that Congress had judged to be unfair and deceptive, resulting

---

**11.** The substantial evidence standard of review apparently does not apply here. On its face, the APA only permits use of the substantial evidence standard in the review of rulemakings and formal adjudications. *See* 5 U.S.C.A. § 706(2)(E) (West 1977); *Joseph E. Seagram & Sons, Inc. v. Dillon*, 344 F.2d 497, 499 n. 3 (D.C.Cir.1965) (COLA decisions not formal adjudications within meaning of APA).

in harm to both competitors and consumers." *Adolph Coors Co. v. Brady,* 944 F.2d 1543, 1547 (10th Cir.1991) (extensive discussion of legislative history of FAA Act as it relates to representations of alcoholic content). Based on the language of this statute, it is apparent that Congress was primarily concerned with consumer deception stemming from sellers' claims regarding the quantity and content of alcoholic beverages.

The Bureau regulations implementing the FAA Act are found in Title 27 of the Code of Federal Regulations. The regulation relied on by the Bureau in this case states that

> No label shall contain any brand name, which, standing alone, or in association with other printed or graphic matter, creates any impression or inference as to the age, origin, identity, or other characteristics of the product unless the Director [of the BATF] finds that such brand name (when appropriately qualified if required) conveys no erroneous impressions as to the age, origin, identity, or other characteristics of the product.

27 C.F.R. § 5.34 (1991) [hereinafter "Section 5.34"]. Like the language of the FAA Act itself, this regulation authorizes the Bureau to evaluate brand names of alcoholic beverage products to determine whether the name is likely to mislead consumers regarding the nature of the contents of the beverage.

Based on the language of the FAA Act and this regulation, the Court finds that the second reason given for revoking the label approval—that the "Black Death" label mocks the dangers of alcohol—is not based on a concern which is relevant under the FAA Act. The basic idea behind this reason given by the Bureau is that by parodying the dangers of alcohol, plaintiffs deceive consumers into believing that alcohol does not have deleterious effects on a person's health. At its root, it is a concern with the marketing of

"Black Death Vodka" as it relates to perceptions of the safety of alcohol in general. This understanding of the Bureau's reasoning is supported by statements made by Terry Cates in the *Wall Street Journal,* where he was quoted as saying that "[h]ad we known the direction the point-of-sale advertising was going to take, I submit we wouldn't have approved [the label]."[12] Wall Street J., Apr. 3, 1992, at B3.

On its face, Section 5.34 does not authorize the Bureau to generally regulate the *marketing* of alcoholic beverages; Section 5.34 is a *labeling* regulation. There must be a possibility of consumer deception as to what is contained within the bottle itself in order for the Bureau to revoke the right to use a label. This understanding of Section 5.34 is consistent with the Bureau's practice in initially approving the labels, where the Bureau decides to approve a label only if the claims regarding the contents of the distilled spirits are borne out by a chemical analysis of the spirits. *See, e.g.,* Letter from Jerry Bowerman to Ann Morse, dated July 24, 1989 (Exhibit A to Cabo Declaration) (chemical analysis of "Black Death Vodka" upon which initial label approval was based). Moreover, it is consistent with the structure of the regulations themselves: while Section 5.34 addresses statements made on product labels, an entirely different subpart of the regulations addresses the advertising of distilled spirits. *See* 27 C.F.R. subpt. H (1991) ("Advertising of Distilled Spirits"). Therefore, revocation of the "Black Death" label based on its alleged mockery of the dangers of alcohol was an improper application of the Bureau's governing statute and regulations.[13]

The other reason given by the BATF for revoking the "Black Death Vodka" label— that consumers will believe the product is poison or contains plague virus—is relevant

---

**12.** The Court may look beyond the administrative record in determining whether an agency considered the relevant factors in making its decision. *See Thompson,* 885 F.2d at 551.

**13.** The Bureau also advances the argument that by diminishing the impact of the mandatory warnings regarding the dangers of alcohol, the name "Black Death Vodka" impliedly violates the Alcoholic Beverage Labeling Act ("ABLA"),

27 U.S.C. § 213. This argument does not change the outcome of the Court's analysis. First, the Bureau completely relied on its authority under Section 5.34 when it revoked plaintiffs' labels. *See, e.g.,* April 1 Letter, at 2. Second, nothing in the ABLA authorizes the Bureau to regulate statements on labels based on their perceived impact on the effectiveness of the ABLA warnings.

to the language and purpose of Section 5.34. The argument here is that consumers will believe that plaintiffs' product does not contain normal alcohol; this is deception regarding the contents of the product.

However, this claim by the Bureau that consumers will believe plaintiffs' products are poisonous lacks a rational basis and must be rejected outright. On its face, this claim is absurd, as plaintiff's product loudly proclaims that it is "vodka." Mere use of the term "death" in conjunction with the image of a grinning skull does not overcome the clear message of the label that the product contains vodka. This reasoning by the Bureau is "so implausible that it [can]not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 44, 103 S.Ct. at 2867.

Even if this claim were not absurd, it is contradicted by the Bureau's alternative reasoning. At the same time that the Bureau claims that the label mocks the dangers of alcohol such that consumers will believe that alcohol is not dangerous, the Bureau also claims that consumers will believe that "the product is inherently unsafe for human consumption at any level." April 1 Letter, at 2. The Bureau cannot have it both ways. While these two claims might be colorable when considered separately, they are contradictory when taken together. The Bureau's reasoning loses its credibility when it is so obviously self-abnegating.

Finally, the history of the BATF's consideration of this label totally undercuts the Bureau's claim that the label on its face leads consumers to believe the product is inherently dangerous. The Bureau admits that its decision to revoke the label approval was solely based on its "administrative expertise" in evaluating the effects of labels when they are considered in isolation. *See* Cates Declaration, ¶¶ 8–9. However, in 1989 and 1990, the Bureau twice approved identical labels in the same exercise of its expertise. Although the Bureau may have the authority to reverse a decision to approve a label, the fact that the Bureau has already approved a label undercuts its claim that the label was improper on its face.

In conclusion, the Court finds that plaintiffs are likely to prevail on the merits of their argument that the BATF's decision was "arbitrary or capricious." On this record, it appears that the Bureau's decision was primarily based on its concerns over the marketing of the vodka, and not on a concern that the consumers would be mislead regarding the vodka's contents. Section 5.34 does not permit the Bureau to regulate labels on this basis.

#### b. *Constitutional Violations*

##### (1) *Due Process*

In order for a person to enjoy the protection of the Due Process Clause of the Fifth Amendment, he or she must have a protected life, liberty or property interest. *See* U.S. Const., amend. V ("No person shall ... be deprived of life, liberty, or property, without due process of law"). Certificates of label approval such as those in question here create property interests because they are given for a potentially unlimited period of time and because their continued existence is essential to plaintiffs' livelihood. As such, the licenses create "important interests" which cannot be "taken away without the procedural due process required by the [Fifth] Amendment." *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (citing *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)); *Richardson v. Town of Eastover,* 922 F.2d 1152, 1156–57 (4th Cir.1991).

The procedural requirements of the Due Process Clause vary according to context. At an absolute minimum, due process requires that an agency give a person adequate notice that a decision is being considered and give that person an opportunity for a hearing. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 427, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982) (citing *Mullane v. Central Hannover Bank & Trust Co.,* 339 U.S. 306, 312, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). Whether a person must be given additional procedural protections depends on the importance of the private interests, the length and finality of a deprivation of a pro-

tected interest, the likelihood of government error, and the magnitude of the government interests involved. *Id.* 455 U.S. at 435, 102 S.Ct. at 1157 (citing cases). There is some support for the idea that revocation of a government license requires the revoking agency to afford a hearing where the licensee can present evidence and confront and cross-examine adverse witnesses; the agency may also be required to make factual findings based solely on the evidence properly made a part of the record at the hearing. *See, e.g., Willner v. Committee on Character & Fitness,* 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963); *see also* 4 Jacob Stein, Glenn Mitchell & Basil Mezines, *Administrative Law,* § 41.02, at 41–8 (1992).

■ The Court finds that the procedures in this case likely deprived plaintiffs of their right to procedural due process. Notice of the revocation was certainly given to plaintiffs in the form of the April 1 Letter and communications that followed in April, May, June and July of 1992. However, plaintiffs were given an inadequate opportunity for a hearing. The initial notice to plaintiffs stated that the Bureau had already made its decision and that plaintiffs had to stop selling their product within ten days. *See* April 1 Letter, at 1. If due process requires that plaintiffs be given an opportunity for a hearing, that hearing must come before the Bureau has made its final decision.[14]

Beyond this, the subsequent meetings between officials at the Bureau and plaintiffs' representatives had serious deficiencies. The meetings were not transcribed, with the predictable result that the Court cannot resolve the factual disputes between the parties regarding what was said at the meetings. Moreover, the Bureau conducted these meetings in a way which apparently confused plaintiffs as to their significance and scope: for example, the parties dispute whether plaintiffs had a right to submit further materials after the April 30 meeting or whether

the Bureau had made its final decision by that time. Next, the concession made at the hearing that the Bureau did not consider new evidence raises serious questions as to the constitutional adequacy of the hearing. If a person entitled to due process is offered only an opportunity to confront administrative expertise rather than evidence, the Bureau would seem to be required to identify the expert, the field of expertise, and the foundation for the opinion, rather than offer a simple pronunciamento. Such ad hoc procedures frustrate the important public concerns behind the requirement of due process.

Finally, the Bureau's decision was not made on the basis of an evidentiary record. Although the Bureau may be able to review initial label applications solely on the basis of its administrative expertise, this expertise does not necessarily provide a sufficient basis to revoke the right to use a label, especially after a certificate holder has heavily invested in that label.

Accordingly, without making a final determination of the constitutional sufficiency of the procedures offered to plaintiffs in this case, the Court finds that plaintiffs are likely to prevail on their claim that the Bureau violated their rights to procedural due process.[15]

### (2) First Amendment

■ As the "Black Death Vodka" label consists of speech, plaintiffs argue that the BATF's revocation of the label violates the First Amendment. The First Amendment does provide some protection of commercial speech. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757–62, 96 S.Ct. 1817, 1823–25, 48 L.Ed.2d 346 (1976). However, speech that is false and misleading is not protected by the First Amendment. *See id.* at 771–74, 96 S.Ct. at 1830–31; *Adolph Coors Co.,* 944 F.2d at 1547. Whether the "Black Death Vodka" label is misleading is precisely the

---

14. The Court does not resolve the factual dispute regarding when the Bureau made its final decision to revoke the "Black Death Vodka" labels. This analysis focuses solely on the form of the notice and its relationship to the opportunity for a hearing.

15. The Court need not reach, and does not now decide, whether the Bureau was required to publish proposed procedures in the *Federal Register* or whether the officials who made the final decision had the authority to act for the Bureau.

issue considered by the Court in evaluating the legitimacy of the Bureau's finding of deception. Accordingly, as the First Amendment claim turns on the Court's ruling on the "arbitrary and capricious" claim, the Court will not now decide this issue.

### c. Action in Excess of Statutory Jurisdiction

██ Plaintiffs next contend that the BATF lacked the authority to cancel the certificates of label approval once they had been approved. Without express statutory or regulatory authority, plaintiffs argue that the BATF cannot cancel a certificate of label approval. In making this argument, they rely on *Jeager v. Simrany*, 180 F.2d 650 (9th Cir.1950). In *Jeager* the Immigration and Naturalization Service ("INS") issued a certificate of lawful entry to plaintiff. The INS subsequently attempted to revoke the certificate on the grounds that it was procured by falsification. *Id.* at 651. The Ninth Circuit held that the INS lacked the authority to revoke the certificate. The Court noted that the INS had specific statutory authority to cancel certain certificates, but that the relevant certificate was not included in the statute. *Id.* at 652–53. While the Ninth Circuit speculated that it may have been "an oversight on the part of Congress" not to have included the relevant certificate, it held that it was not up to the courts to cure the situation. *Id.* at 653. However, the Ninth Circuit went on to state:

> It is also arguable that in the absence of the specific provisions of [the statute, the INS] Commissioner, under his general powers of regulation ... could provide for the cancellation of all the various certificates issued by him or his deputies, but in view of the limitations inherent in the specific provisions of that section, that power cannot be held now to exist.

*Id.*

The BATF concedes that neither the statute nor the regulations expressly grant the Bureau the authority to cancel a certificate of label approval once it has been approved. *See* BATF Final Decision, at 7. However, the Bureau contends that it has implied authority to "reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration." *See Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir.1989). In the *Gun South* case, the court upheld a decision by the BATF to revoke a license to import assault rifles. *Id.* at 859–60. The Bureau argues that the holding of this case is more relevant to the situation faced here.

Without performing an extensive analysis of this issue, the Court decides for the purposes of this preliminary injunction that the Bureau does have the authority to revoke a certificate of label approval. This authority obviously is limited by the due process protections implicit in the fact that the certificates create property interests on the part of their holders. The Court need not conclusively decide this issue at present, however, as plaintiffs have demonstrated a likelihood of success on the merits of other claims.

### d. Conclusion

Plaintiffs have demonstrated a likelihood of success on the merits of two claims. First, they are likely to succeed in demonstrating that the BATF's decision to revoke their certificates of label approval was "arbitrary and capricious." Second, they are likely to succeed in demonstrating that the Bureau violated their rights to due process by providing them with inadequate procedural protections. Accordingly, this prong of the preliminary injunction analysis weighs strongly in favor of enjoining the Bureau's decision to revoke the certificates.

### 2. Threat of Irreparable Harm

██ As the Court has found that there is a high likelihood of success on the merits, a preliminary injunction is required if there is any significant possibility of irreparable harm. *See Miss World (UK)*, 856 F.2d at 1448. Plaintiffs attempt to demonstrate that the BATF's revocation of their certificates will cause them irreparable harm in two basic ways.

██ First, plaintiffs assert that without the "Black Death" label, they will be unable to sell vodka and therefore will go out of business. *See* Plaintiffs' Memorandum in

Support of Application for Temporary Restraining Order, at 24; Cabo Declaration, ¶ 29; Supplemental Declaration of Federico Cabo, ¶ 1. Based on the evidence in the record, the Court finds this claim to be unpersuasive in light of the Bureau's approval of the "Black Hat" labels. Revocation of the "Black Death" labels does not prevent plaintiffs from selling vodka; it only prevents them from selling vodka under the name "Black Death."

Plaintiffs attempt to ameliorate this weakness in their argument by asserting that they are contractually bound to use only the "Black Death" name. According to Federico Cabo, the agreement under which Black Death USA purchased the rights to the "Black Death" brand name requires Black Death USA "to use [the "Black Death" name] exclusively for any vodka which it market[s]." Cabo Declaration, ¶ 32. This agreement has not been submitted to the Court, and based on the declarations that have been submitted, it is unclear to what extent V.T. Sigurdsson's retains rights to the "Black Death" name other than the right to receive royalties. However, given the fact that Black Death USA exists solely for the purpose of holding the rights to the brand name "Black Death," the Bureau's revocation would eliminate the corporation's raison d'être.

Plaintiffs' second claim of irreparable harm is that loss of the right to sell vodka under the "Black Death" label will cause them to lose the benefit of all the consumer goodwill that has developed toward "Black Death Vodka." See Cabo Declaration, ¶ 31. The Court finds this to be a very real possibility. Plaintiffs have invested over $1 million in promoting and marketing "Black Death Vodka." Id. ¶¶ 11–12. These efforts have largely focused on the word "death" in the label, as evidenced by the promotional slogan "drink in peace" and the packaging of the vodka in miniature coffins. To take away the name which makes plaintiffs' vodka distinctive to the alcohol consuming public would cause drastic if not irreparable harm to plaintiffs' ability to successfully market their product. This outcome is especially likely in light of the Bureau's apparent refusal to permit plaintiffs to note on the proposed "Black Hat" labels that the product was formerly named "Black Death Vodka." Id. ¶ 31.

The Bureau attempts to counter this claim of irreparable injury by arguing that plaintiffs will be able to recover damages for any loss of sales. This is argument appears to be disingenuous, as the Court is not sure that plaintiffs will even be able to state a claim for damages against the Bureau; the Bureau's own position is that it may not be held liable for damages. Moreover, given the relative youth of plaintiffs' "Black Death Vodka" business, it may prove very difficult if not impossible to actually value plaintiffs' losses due to the Bureau's action. Accordingly, the Court gives the Bureau's argument very little weight on this motion for a preliminary injunction.

The probable effect of the Bureau's decision to revoke plaintiffs' certificates of label approval will be to eviscerate—if not destroy—plaintiffs' business. Even if sales of vodka could go forward under the "Black Hat" label, plaintiffs would lose all the goodwill and product identity under the "Black Death" label that they have worked hard to establish. This possible outcome easily constitutes irreparable harm.

## CONCLUSION

The Court finds that plaintiffs are likely to succeed on the merits of its arbitrary and capricious claim and on its due process claim. Without ruling on the remaining arguments, plaintiffs have satisfied the first element of a claim for preliminary injunctive relief. Plaintiffs are also likely to suffer severe and irreparable injuries if the Bureau's decision is not enjoined, as a prohibition on use of the name "Black Death Vodka" could slash their economic prospects. Weighing these equities, the Court finds that both prongs of the test for preliminary injunctive relief have been met and accordingly ENJOINS the Bureau from revoking plaintiffs' certificates of label approval.

IT IS SO ORDERED.