CABO DISTRIBUTING CO., INC. and
Black Death USA, Plaintiffs,

v.

Nicolas BRADY, et al., Defendants.

No. C–92–2591 DLJ.

United States District Court,
N.D. California.

Oct. 22, 1992.

George G. Weickhardt of Adams, Duque & Hazeltine, San Francisco, CA, for plaintiffs.

Peter Modlin, U.S. Dept. of Justice, Washington, DC, for defendants.

ORDER

JENSEN, District Judge.

On September 18, 1992, the Court heard plaintiffs' motion for summary judgment and defendants' motion to dismiss or, in the alternative, for summary judgment. At the hearing, George G. Weickhardt of Adams, Duque & Hazeltine appeared for plaintiffs and Peter Modlin of the Department of Justice appeared for defendants. Having considered the papers submitted and the arguments of counsel, the Court GRANTS plaintiffs' motion for summary judgment and DENIES defendants' motion to dismiss or for summary judgment for the following reasons.

**BACKGROUND**

The facts of this case are complex and have been described in detail in this Court's order dated July 22, 1992, 821 F.Supp. 582, setting forth the basis of the preliminary injunction it entered on July 10, 1992. Much of the factual background is repeated here for completeness.

This is an action over the right to sell vodka under the label "Black Death Vodka." Plaintiff Black Death USA is a California corporation which owns all rights to "Black Death Vodka." Plaintiff Cabo Distributing Company, Inc. ("Cabo") is a California corporation which imports and distributes the vodka. See Declaration of Federico Cabo, ¶¶ 1, 3 [hereinafter "Cabo Declaration"]. Defendants are the United States Department of the Treasury, the Bureau of Alcohol, Tobacco and Firearms ("BATF" or "Agency"), and officials of these agencies.

A. *Development of "Black Death Vodka".*

"Black Death Vodka" was originally made by the Sigurdsson family in Iceland in the early 1900's. See Cabo Declaration, ¶ 5. The name "Black Death" apparently is a translation of a colloquial name for vodka used in Iceland and Scandinavia and does not refer to the plague which ravaged Europe from 1347 into the Nineteenth Century. *Id.* ¶¶ 5–6. According to one of the declarations submitted to the Court, the name developed during Iceland's prohibition era. When people would drink excessive quantities of bootleg vodka, they would sometimes fall in the street and lay there in a drunken stupor. Remaining there for hours or days, these derelicts would appear to be dead to passersby. The name "black death" was used to describe the bootleg distilled spirits which caused this maudlin condition. See Declaration of Terry Cates, ¶ 10 [hereinafter "Cates Declaration"] (recounting explanation told to him by Thomas Lines of Cabo Distributing Company).

The Sigurdsson family recipe emerged from the shadows of Icelandic anonymity in 1975 when Valgier Tomas Sigurdsson moved to Europe. Cabo Declaration, ¶ 6. He began to produce "Black Death Schnapps" in 1985 and "Black Death Vodka" in 1986. *Id.* Winning several international awards for quality, Sigurdsson was selling "Black Death Vodka" in over forty countries within a few years. *Id.* ¶¶ 6–7. In every country where it is sold, the "Black Death" label is used. *Id.* ¶ 7.

In 1989, Cabo acquired the right to import "Black Death Vodka" into the United States. *Id.* ¶ 8. Pursuant to federal law, Cabo applied to the BATF for approval of the label. Three applications were submitted to the BATF: one for labels on single liter bottles, one for labels on 750 milliliter bottles, and one for labels on 50 milliliter bottles. See *id.;* Applications for and Certification/Exemption of Label/Bottle Approval, submitted July 20, 1989 (Exhibits B–D to Cabo Declaration). After reviewing these applications, the

BATF approved the "Black Death" labels on June 24, 1989. *Id.*

All of the labels are substantially the same. On the front of the bottle, the words "Black Death Vodka" appear in large type surrounding a grinning skull wearing a top hat.[1] On the rear of the bottle, there is a mandatory government warning regarding the dangers of alcohol consumption and the statement "Don't Drink and Drive." *See id.*

Once the labels were approved, Cabo began to promote and market "Black Death Vodka" in the United States. Between July 1, 1989 and April 1, 1992, Cabo Distributing Company spent over $1 million promoting and marketing the vodka.[2] *Id.* ¶¶ 11–12. In this promotional campaign, Cabo apparently targeted young alcohol drinkers by using such techniques as selling bottles in miniature coffins and associating the vodka with slogans such as "Drink in Peace." *See* Letter from United States Surgeon General Antonio Novello to William Earle at BATF, dated July 2, 1992 (attached to Exhibit G to Declaration of George G. Weikhardt); Wall Street J., Apr. 3, 1992, at B1 ("Lines [at Black Death USA] agrees that the vodka has a youthful target market"). In addition, Cabo hired Saul Hudson, who is also known as "Slash" in his role as lead singer of the musical quartet "Guns 'n Roses," to promote "Black Death Vodka." *See* Cabo Declaration, ¶ 12. These marketing efforts were successful, and by the beginning of 1992, the spirits were being distributed by Cabo in California, Illinois, Pennsylvania, Maryland, Florida, New Jersey, and New Mexico.[3] *See* Cabo Declaration, ¶ 11.

On April 1, 1992, Federico Cabo incorporated Black Death USA for the purpose of purchasing the rights to "Black Death Vodka" from Valgier Sigurdsson. Sigurdsson agreed to sell the rights to the vodka for approximately $3.3 million, of which $550,000 in cash was paid in April and $2.75 million was guaranteed in royalties. *See* Cabo Declaration, ¶ 12. Although a copy of the agreement has not been submitted to the Court, plaintiffs assert that the royalty payments are guaranteed regardless of how much vodka is actually sold. *Id.* Plaintiffs assert that this purchasing decision, as well as the money invested in the advertising campaign, was made in reliance on the BATF's approval of the "Black Death" labels. *Id.* ¶ 11.

B. *Revocation of the "Black Death" Label.*

In early 1992, plaintiffs' advertising campaign began to concern members of the health care community and of the public that "Black Death Vodka" was improperly encouraging alcohol abuse on the part of young people. Among others, the United States Surgeon General, Antonia Novello, made statements on the "Today Show" in which she criticized plaintiffs' decision to market the vodka to young people. *See* Wall Street J., Apr. 3, 1992, at B1 (Exhibit J to Cabo Declaration). When the BATF learned of this criticism of "Black Death Vodka," it decided to reexamine its approval of the label. *See* Cates Declaration, ¶ 12 (". . . while we were looking at the label in and of itself, we were aware of the publicity surrounding the product, and this may have played a role in our decision to take a second look at the label."). Terry Cates, who is Chief of the Industry Compliance Division of the BATF, was quoted in the *Wall Street Journal* as stating that "[h]ad we known the direction of the point-of-sale advertising was going to take, I submit we wouldn't have approved [the label]." Wall Street J., Apr. 3, 1992, B3.

---

1. The owner of Cabo Distributing Co., Federico Cabo, provides his own aesthetic impression of the front label for the Court. He states that "[t]he skull appearing on the front of the bottle is not a symbol for poison, which is a skull and cross-bones. Instead, it is quite a distinctive, smiling, genial skull with a top hat." Cabo Declaration, ¶ 9. In contrast, journalists and others describe the skull as a "macabre image[.]" *See* Montreal Gazette, May 17, 1992, at B5 (attached to Final BATF Approval Decision, dated July 6, 1992 (Exhibit G to Declaration of George Weikhardt)).

2. Federico Cabo also states that he and his employees invested "thousands of hours . . . of highly valuable personal time" in this effort. Cabo Declaration, ¶ 12.

3. There also may have been attempts to distribute the vodka in Massachusetts and Texas. According to defendants, both of those states have specifically refused to allow plaintiffs to sell the vodka under the "Black Death" label. *See* Cates Declaration, ¶ 12.

On April 1, 1992, Terry Cates sent a letter to Federico Cabo regarding the label. The letter stated that the BATF had "reexamined the matter" and decided that the labels were in violation of BATF regulations; plaintiffs were given ten days to stop selling vodka under the "Black Death" label.

Cates stated that the labels violated the regulations in two ways. First, he stated that the reference to the Black Death, which "was a plague which killed millions of people," combined with the skull image, created an impression "that the product is inherently unsafe for human consumption at any level." *See* Letter from Terry Cates to Federico Cabo, dated Apr. 1, 1992, at 2 (Exhibit G to Cabo Declaration).

Second, Cates stated that the label "mocks the real health risks which may result from the consumption of alcohol by making an obviously false claim about the dangers of alcohol consumption." *Id.* This parody had the "overall effect of undermining the effect of the Surgeon General's warning on the label of the vodka. *Id.*

The Bureau stated that its decision to revoke approval of the label was based on its authority pursuant to the Federal Alcohol Administration Act ("FAA Act"), 27 U.S.C. § 205(e). This statute authorizes the BATF to promulgate regulations of alcoholic beverage labels which will "prohibit deception of the consumer." The BATF's regulations require the Bureau to reject labels which "convey[ ] erroneous impressions as to the age, origin, identity, or other characteristics of the product." 27 C.F.R. § 5.34(a). According to Cates, the "Black Death" label mislead the consumer into thinking either (or both) that the vodka was poison or that there are no substantial risks associated with the consumption of alcohol. Letter from Terry Cates to Federico Cabo, dated Apr. 1, 1992, at 2 (Exhibit G to Cabo Declaration). The latter message also had the effect of undermining the message contained in the Surgeon General's warning printed on the rear label. *Id.*

Plaintiffs arranged to meet with the government regulators on April 7, 1992 in Washington, D.C. At this meeting, plaintiffs were represented by Federico Cabo, Thomas Lines, and James Cooper, who were all shareholders and directors of Black Death USA, and George Weickhardt, their attorney. The Bureau was represented by Terry Cates, John J. Manfreda, who is the Associate General Counsel of the BATF, Candace Moberly, who is the Chief of the Product Compliance Branch, and others.

In their discussion of the April 1 letter, the Bureau officials stood by their reasoning that the "Black Death" label was misleading. They stated that they had made this decision without reference to any consumer survey, but rather on their administrative expertise in determining whether a label is misleading on its face. *See* Cates Declaration, ¶¶ 8–9; Cabo Declaration, ¶ 16. Plaintiffs stated that they believed the Bureau was not justified in revoking approval of the labels and that they wanted more time to respond to the letter. Cates Declaration, ¶ 7. The Bureau agreed to postpone their revocation of the labels until June 11, 1992 in order to give plaintiffs time "to provide written arguments and evidence to show that the [label approvals] should not be cancelled"; this extension was confirmed in an April 8 letter. *See id.* ¶ 13; Letter from Terry Cates to Federico Cabo, dated April 8, 1992 (Exhibit J to Cabo Declaration).

The parties met a second time on April 30 to discuss revocation of the label approval. At this meeting, plaintiffs were represented by Cabo and Lines and the Bureau was represented by Cates, Moberly, and a BATF staff attorney. According to the Bureau, plaintiffs approached this meeting with an eye to negotiating a settlement of the dispute rather than setting up litigation. *See* Cates Declaration, ¶ 14 ("At the outset of this meeting, Mr. Lines noted that they had not brought their counsel to this meeting, and that they hoped that this matter could be resolved without resorting to expensive and time-consuming litigation."); *see also* Cabo Declaration, ¶¶ 18–19.

Plaintiffs offered to do three things to correct any misconceptions created by the "Black Death" label. First, they offered to put a qualifying statement on the back of the bottles explaining that "Black Death Vodka"

was not associated with the bubonic plague and encouraging consumers not to drink and drive. *See* Cabo Declaration, ¶ 18; Exhibit K to Cabo Declaration (text of proposed statement). Second, they offered to include a warning against alcohol abuse and underage drinking in future advertising. *See* Cabo Declaration, ¶ 19; Exhibit L (text of proposed statement). Third, they offered to distribute copies of "Black Death's Survival Guide" to "social hosts and hospitality professionals." This pamphlet would provide information about the health effects of alcohol abuse and make suggestions about how to identify underage drinkers. *See* Cabo Declaration, ¶ 19; Exhibit M (draft of the pamphlet).

The Bureau officials rejected these offers. According to Cates, plaintiffs were told that such efforts would be laudable in and of themselves but would be insufficient to overcome the negative impressions created by the label. *See* Cates Declaration, ¶ 15. The Bureau claims that its decision was not yet final at this point, however, and that they would continue to consider offers from plaintiffs. *Id.* ¶ 16. A temporary license was issued by the Bureau in order to permit plaintiffs to sell off existing stocks of vodka bottled under the "Black Death" label; plaintiffs were given until September 11, 1992 to do so. *See* Cabo Declaration, ¶¶ 20, 24; Exhibits S–T to Cabo Declaration (temporary permits); Declaration of Candace Moberly, ¶¶ 16–19 [hereinafter "Moberly Declaration"].

Plaintiffs present a different account of the meeting. They state that Cates rejected these offers out of hand, and told them that "Whatever you say doesn't make any difference to me. Your label is dead. I have already decided to cancel it." *See* Cabo Declaration, ¶ 20. Plaintiffs also claim that Cates told them that the Bureau had already made its final decision on the labels and that further papers would be futile. *Id.* Cates allegedly also backed off the Bureau's claim that consumers would believe that the vodka was associated with the bubonic plague, and stated that the Bureau's problem with the label focused around the term "Death." *Id.*

Once the Bureau had rejected the offer of corrective labelling and advertising, the parties began to discuss alternative names for the product. Plaintiffs stress in their papers that they only began to suggest alternative names when it became clear that the BATF would not permit them to continue using the name "Black Death Vodka." Lines suggested that the name "Black Hat" could be used. When the Bureau received applications for labels under that name on May 8, 1992, they were approved.

Plaintiffs allege that this entire process violated their rights under the Administrative Procedure Act ("APA") and the Constitution by revoking the approval without cause. They claim that the BATF made its decision before receiving any input from them, both before April 1 and before April 30. This early regulatory decision came in spite of the fact that plaintiffs never waived any of their rights to the name "Black Death."

The Bureau apparently believed, on the other hand, that the parties had settled the dispute in the April 30, 1992 meeting. This is reflected in statements by Candace Moberly, the expedited approval of the "Black Hat" label, and plaintiffs failure to actually submit anything in writing prior to June 11, 1992.

Sometime in June, plaintiffs began to have second thoughts about their situation. Although they had received approval for "Black Hat," plaintiffs came to the conclusion that they needed to continue to use the "Black Death" label. First, plaintiffs concluded that consumers would be unable to identify the new vodka as being the same vodka sold under the "Black Death" label. There is an assertion in one of the declarations that the BATF would not permit the new "Black Hat" labels to state that the product was formerly sold under the "Black Death" label. Cabo Declaration, ¶ 31. Second, plaintiffs claim that V.T. Sigurdsson refused to put his name on any bottles without the name "Black Death." Third, plaintiffs assert that under the purchase agreement in which they acquired the "Black Death" name from Sigurdsson, they are required to only sell the vodka under the name "Black Death."

Apparently the real reason for the reassessment is the fact that "Black Death Vodka" sales have begun to skyrocket. Due to the publicity surrounding the decision of the BATF in this case, "Black Death Vodka" sales have reportedly jumped significantly, with Cabo now pushing for nationwide distribution of the vodka and the introduction of "Black Hat Tequila," which would feature a smiling skull wearing a sombrero. *See* Montreal Gazette, May 17, 1992, at B5; London Guardian, May 13, 1992 (both attached to BATF Final Decision).

Whatever the reason, plaintiffs petitioned the BATF for reconsideration of their decision in June. The Bureau refused and issued a "final decision" on July 6, 1992. *See* Exhibit G to Weickhardt Declaration. When plaintiffs received this document, they filed an action for to temporarily enjoin defendants from revoking the certificate of label approval ("COLA").

On July 10, 1992, this Court issued a preliminary injunction prohibiting the BATF from revoking plaintiffs' certificates of label approval. Plaintiffs now bring this motion for summary judgment. Defendants bring cross-motions to dismiss, or in the alternative, for summary judgment.

## DISCUSSION

### A. *Legal Standards.*

#### 1. *Summary Judgment Standard.*

Rule 56 governs motions for summary judgment. This rule states that summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(e).

In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Electrical Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catreit,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1983); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986)) (emphasis in original).

■ On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. To succeed on summary judgment plaintiff must prove each element essential of the claims upon which it seeks judgment by undisputed facts. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (party with burden "must establish beyond peradventure *all* of the essential elements ..." (emphasis original)). In an influential article, Judge Schwarzer has phrased plaintiff's as follow: "Where the moving party has the burden [of proof at trial ...,] his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–488 (1984).

■ In contrast, defendant' motion for summary judgment faces a lighter burden. Because the defendant does not bear the burden of proof at trial, the defendant need only point to the insufficiency of the plaintiff's evidence to shift the burden to the plaintiff to raise genuine issues of fact as to each claim by substantial evidence. *T.W. Electrical Service, Inc. v. Pacific Elec. Contractors Assoc.,* 809 F.2d 626, 630 (9th Cir. 1987) *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1983); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986). If plaintiff fails to raise a genuine issues of fact, then summary adjudication in favor of the defendant will be granted.

When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party. *T.W. Electrical*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir.1991). Regardless of who is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. The standard for judging a motion for summary judgment is the same standard used to judge a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ In meeting their burdens of proof, each party must come forward with admissible evidence. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir.1985); *Thornhill Publishing Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762–63 (9th Cir.1980). Plaintiffs must ultimately persuade the Court in opposing summary judgment that they will have sufficient admissible evidence to justify going to trial.

## 2. *Motion to Dismiss Standard.*

■ Motions to dismiss are governed by Federal Rule of Civil Procedure 12. Under Rule 12(b)(6), a defendant may seek to dismiss the complaint for "failure to state a claim upon which relief can be granted." The Court's analysis under Rule 12(b)(6) requires it to determine whether the facts alleged in the complaint would entitle the plaintiff to a legal remedy. As a primary objective of the legal system is to obtain a determination on the merits, rather than a dismissal based on the pleadings, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are generally viewed with disfavor. The Supreme Court has held that a complaint should not be dismissed unless it appears "beyond doubt" that plaintiff can prove no set of facts in support of the claim which would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Thus, the question presented by a motion to dismiss is not whether plaintiff will prevail in the action, but whether she is entitled to offer evidence in support of her claim. *Scheuer v. Rhodes*, 416 U.S. 232, 235, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In answering this question, the Court must assume that plaintiff's allegations are true and must draw all reasonable inferences in plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings indicates that the chance of recovery is remote, the Court must allow plaintiff to develop her case at this stage of the proceedings. *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir.1981).

■ If the Court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is only denied if it is clear that amendment would be futile and " 'that the deficiencies of the complaint could not be cured by amendment.' " *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir.1987) (quoting *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (per curiam); *see, Poling v. Morgan*, 829 F.2d 882, 886 (9th Cir.1987) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)) (futility is basis for denying amendment under Rule 15).

## B. *Analysis.*

### 1. *Procedural Due Process.*

Plaintiffs argue that the BATF's revocation of the "Black Death Vodka" label violated their right to procedural due process. In order for a person to enjoy the protection of

the Due Process Clause of the Fifth Amendment, he or she must have a protected life, liberty or property interest. *See* U.S. Const., amend. V ("No person shall … be deprived of life, liberty, or property, without due process of law").

### a. *Protected Property Interest.*

■ This Court in its July 19, 1992 order issuing a preliminary injunction stated that:

Certificates of label approval such as those in question here create property interests because they are given for a potentially unlimited period of time and because their continued existence is essential to plaintiffs' livelihood. As such, *the licenses create "important interests" which cannot be "taken away without the procedural due process required by the [Fifth] Amendment." See Bell v. Burson* [402 U.S. 535, 539] 91 S.Ct. 1586, 1589 [29 L.Ed.2d 90] (1971) (citing *Sniadach v. Family Finance Corp.* [395 U.S. 337] 89 S.Ct. 1820 [23 L.Ed.2d 349] (1969), and *Goldberg v. Kelly* [397 U.S. 254] 90 S.Ct. 1011 [25 L.Ed.2d 287] (1970)); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1156–57 (4th Cir.1991).

The parties dispute whether the label "Black Death" is a property interest protected under the Due Process Clause. Plaintiffs argue that they have invested substantial time and money in promoting their brand name, "Black Death." They claim that "Black Death" is their trademark, and cite *Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir.1948), in support of the proposition that a trademark is a protected property right.

Defendants, on the other hand, point out that a protected property interest exists only where the individual has a "legitimate claim of entitlement" to the property, *Board of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), not merely where there is an "action which will cause grievous loss of any kind." Plaintiffs' Motion for Summary Judgment Brief, at 13. Defendants argue that plaintiffs have no legitimate entitlement to a "Black Death" label because trademarks, which are protected under the

Fifth Amendment, are entirely distinct from COLAs, which are not. Defendants' Opposition Brief, at 7.

The Court finds the defendants' argument unpersuasive. A trademark or trade dress is "one of the visible mediums *by which a good is identified,* bought or sold and known to the public." *Coca Cola Bottling Co. v. Coca Cola Company,* 269 F. 796 (D.C.Del.1920) (emphasis added). COLAs are certificates of label approval which enable parties to use certain labels on their bottles for *purposes of identifying the product* and informing consumers about the contents. Plaintiffs have clearly spent substantial amounts of time and money promoting their "Black Death Vodka" and building consumer recognition and goodwill in their label much like a trademark.[4] Ensuring adequate protection of plaintiffs' procedural rights is of particular concern in this case because plaintiffs have indisputably relied on the Government's previous approval of the label. Plaintiffs therefore have a legitimate entitlement to the label "Black Death," and are therefore afforded certain procedural protections under the Fifth Amendment.

### b. *Procedural Requirements to Ensure Due Process.*

■ Given that COLAs are a protected property interest under the Due Process Clause, plaintiffs must next establish that the BATF violated the procedural requirements mandated by the Constitution. The procedural requirements of the Due Process Clause vary according to context. At an absolute minimum, due process requires that an agency give a person adequate notice that a decision is being considered and give that person an opportunity for a hearing. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 426, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982) (citing *Mullane v. Central Hannover Bank & Trust Co.,* 339 U.S. 306, 311, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). Whether a person must be given additional procedural protections depends on the importance of the private interests, the length and finality of a deprivation of a protected interest, the likeli-

---

4. Between July 1, 1989 and April 1, 1992, Cabo spent over $1 million promoting and marketing the vodka. Cabo Declaration, ¶ 11–12. In addition, they hired Saul Hudson of the musical quartet "Guns 'n Roses" to promote the vodka. Cabo Declaration, ¶ 12.

hood of government error, and the magnitude of the government interests involved. *Id.* 455 U.S. at 434, 102 S.Ct. at 1157 (citing cases).

 There is some support for the idea that revocation of a government license requires the revoking agency to afford a hearing where the licensee can present evidence and confront and cross-examine adverse witnesses. *See, e.g., Willner v. Committee on Character & Fitness,* 373 U.S. 96, 102, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963); *see also* 4 Jacob Stein, Glenn Mitchell & Basil Mezines, *Administrative Law,* § 41.02, at 41–8 (1992). Plaintiffs are entitled to a formal adjudicatory hearing prior to cancellation of the COLAs where (1) they meet the test in *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 903, 47 L.Ed.2d 18; 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and (2) there are material facts in dispute. Plaintiff's Motion for Summary Judgment Brief, at 12–17; Defendant's Opposition Brief, at 8.

Specifically, *Eldridge* discusses three factors courts consider in determining whether an adjudicatory hearing is necessary: (1) the private interest that will be affected by the official action, (2) the risk of erroneously depriving the interest, and (3) the government's interest, including the fiscal and administrative burdens required by the additional procedural requirements.

Regarding the first factor, the plaintiffs convincingly argue that the private interest that will be affected by the official action is substantial, especially when one considers that the economic viability of plaintiffs' business may depend on the label "Black Death Vodka." Defendants respond that "plaintiffs are not being deprived of the right to engage in the business of importing or selling their vodka.... [They] remain free to do so under a differently designed label. Plaintiffs would have the Court believe that without

the 'Black Death' label; they face immediate financial ruin."

The Court finds the defendants' argument unconvincing. The economic viability of the plaintiffs' business depends on their use of the name "Black Death Vodka." They have developed substantial name recognition and goodwill in their label and while plaintiffs may not face "immediate financial ruin," it is likely that sales will decrease and plaintiffs will suffer significant economic injury if they cannot import and sell vodka using the "Black Death" label. The sales of "Black Death Vodka" have recently skyrocketed due to plaintiff's advertising investments and at least in part, the publicity surrounding the BATF's decision in this case.

The second factor of *Eldridge* concerns the fairness and reliability of the existing pretermination procedures and the probable value, if any, of additional procedural safeguards. On the one hand, some procedural safeguards were followed: plaintiffs were notified of the reasons for the proposed cancellation, given several opportunities to submit evidence, and provided opportunities to meet with agency officials. On the other hand, the risk of an erroneous deprivation of the protected interest was substantial because the BATF has no written procedures or substantive criteria to govern cancellation of labels. While notice of the revocation was certainly given to plaintiffs in the form of the April 1 Letter and communications that followed in April, May, June and July of 1992, plaintiffs were given an inadequate opportunity for a hearing. The initial notice to plaintiffs stated that the Bureau had already made its decision and that plaintiffs had to stop selling their product within ten days. *See* April 1 Letter, at 1. If due process requires that plaintiffs be given an opportunity for a hearing, that hearing must come before the Bureau has made its final decision.[5]

---

**5.** Defendants state that the April 1, 1992 letter was not a final decision. To the contrary, the Court finds that the letter indicated the BATF's decision to revoke the license in the absence of any response from plaintiffs. The letter states: "The Bureau of Alcohol, Tobacco and Firearms (ATF) has reexamined ... [the COLAs for "Black Death" vodka] and has determined that the la-

bels are in violation of ATF regulations.... AFT intends to cancel the certificates of label approval ... within 10 days from the date of this letter. You may submit written evidence to establish that the labels are in conformance with the standards of 27 C.F.R. § 5.34(a)." Letter to Federico Cabo from Terry L. Catès, dated April 1, 1992.

Beyond this, the subsequent meetings between officials at the BATF and plaintiffs' representatives had serious deficiencies. There was no written record of the meetings; thus the Court cannot resolve the factual disputes between the parties regarding what was said at the meetings. Moreover, the Bureau conducted these meetings in a way which apparently confused plaintiffs as to their significance and scope: for example, the parties dispute whether plaintiffs had a right to submit further materials after the April 30 meeting or whether the Bureau had made its final decision by that time. Next, the concession made at the hearing before this Court that the BATF did not consider new evidence raises serious questions as to the constitutional adequacy of the hearing. If a person entitled to due process is offered only an opportunity to confront an assertion of administrative expertise rather than identified evidence, the BATF would seem to be required to identify the expert, the field of expertise, and the foundation for the opinion, rather than offer a simple pronunciamento. Such ad hoc procedures frustrate the important public concerns behind the requirement of due process. In this context, due process requires more than the opportunity to present your own case, it must include the ability to confront the case against you. Notice that the agency relied upon "administrative expertise" for its decision without an articulated foundation for that conclusion simply does not permit the exercise of the right of confrontation required by due process.

Finally, the BATF's decision was not made on the basis of an evidentiary record. Although the BATF may be able to review initial label applications solely on the basis of its administrative expertise, this expertise does not necessarily provide a sufficient basis to revoke the right to use a label, especially after a certificate holder has heavily invested in that label. Plaintiffs were neither informed of the expertise of the decision makers who revoked their label nor provided a written record of the revocation process so that they might understand the process and question the decision.

Regarding the third factor in the *Eldridge* test, there is little indication that the procedural requirements would create that great of a burden on the government. Defendants argue that the government has a strong interest in protecting consumers from misleading alcohol labels and that the imposition of additional procedures, such as requiring the BATF to conduct quasi-judicial hearings before revoking erroneously issued COLAs, would hinder the BATF in carrying out its functions. The Court finds these arguments unpersuasive. There is nothing before this Court which suggests that revocation by the BATF of COLAs it has previously approved is a frequent occurrence. To the contrary, the lack of any regulation process for this action suggests that it is not. This Court is not persuaded that the time and effort necessary to provide such a process would create any great burden on the agency, financial or otherwise.

The parties also disagree as to whether there were material facts in dispute regarding the revocation of the COLA, and therefore, whether a pre-termination hearing was required. Defendants argue that there were no material facts in dispute. They state, "[BATF] relied entirely upon its administrative expertise in reaching its decision to revoke the COLA's. In such situations, where the only matters to be decided are of law and policy, due process does not require an evidentiary or trial-type hearing. *Connecticut State Department of Public Welfare v. Department of HEW*, 448 F.2d 209, 212 (2d Cir.1971); *Yee-Litt v. Richardson*, 353 F.Supp. 996, 998 (N.D.Cal.1973)." Defendants' Opposition Brief, at 8.

But "administrative expertise" itself is a disputed material fact. Whether the purported expert is qualified to render an expert opinion, whether the supposed expert has reasonably relied on data used by experts in the field, and whether the opinion is supportable by facts are all disputed evidentiary material facts necessarily included in the ultimate disputed fact—the opinion itself. Defendants argue that Mr. Cates and Ms. Moberly along with their staff at the BATF had substantial expertise to review the record and make the decision to revoke the "Black Death" COLA. But, plaintiffs were never told what expertise these individuals or their

staff had, nor were they provided a written record of the procedures employed or actions taken in the exercise of authority revoking the "Black Death" label. Defendants argue that the expertise of Mr. Cates and Ms. Moberly comes from "decades of reviewing labels," but this general assertion of supposed expertise misses the point. The expertise relied upon to revoke the "Black Death" COLA apparently relates to knowledge of consumer perception and behavior, and to the assessment of the likelihood of consumer confusion in the market caused by the label and associated advertising of the product. It does not relate to the assumed expertise of Mr. Cates and Ms. Moberly to discern misimpressions conveyed by the label as to the product in 'the container.

Thus, in light of the plaintiffs' ability to meet the test in *Eldridge,* the existence of material facts in dispute, and the failure to provide an adjudication hearing before cancellation of the COLA, the Court finds that the plaintiffs have been deprived of their constitutional right to procedural due process.

### 2. *Statutory Authority of the BATF.*

■ Under the APA, agency decisions may be "h[e]ld unlawful and set aside" if they are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2) (West 1977). Plaintiffs argue that the BATF acted outside its statutory authority because "there is absolutely no delegation of authority to suspend or revoke COLAs in the FAA." Plaintiffs' Motion for Summary Judgment Brief, at 24. Defendants respond by arguing that the BATF has implied authority under the FAA to cancel a label that was erroneously issued.

■ The Court finds that there is no express delegation of authority in the BATF to suspend or revoke previously granted COLAs. While there is delegated authority to approve COLAs, the authority to revoke COLAs does not automatically derive from the authority to approve COLAs. Without statutory authority or regulatory authority, the BATF cannot cancel a certificate of label approval.

In *Jeager v. Simrany,* 180 F.2d 650 (9th Cir.1950), for example, the Immigration and Naturalization Service ("INS") issued a certificate of lawful entry to plaintiff. The INS subsequently attempted to revoke the certificate on the grounds that it was procured by falsification. *Id.* at 651. The Ninth Circuit held that the INS lacked the authority to revoke the certificate. The Court noted that the INS had specific statutory authority to cancel certain certificates, but that such authority for the relevant certificate was not included in the statute. *Id.* at 652–53. While the Ninth Circuit speculated that it may have been "an oversight on the part of Congress" not to have included the relevant certificate, it held that it was not up to the courts to cure the situation. *Id.* at 653.

The BATF contends that it has implied authority to "reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration." Defendants cite *Gun South, Inc. v. Brady,* 877 F.2d 858, 862–63 (11th Cir.1989), in support of their argument. In *Gun South,* the BATF temporarily suspended an import permit for semiautomatic weapons upon discovering that it had previously issued the permit in error. The court upheld the decision by the BATF to revoke the license to import assault rifles because the initial approval was in error.

■ While there is some authority in support of the argument that agencies may reconsider their decisions even absent express statutory authority providing for such review, "an agency may undertake such reconsideration only if it does so within a reasonable time period and affords the claimant proper notice of its intent to reconsider the decision." *Dun & Bradstreet v. U.S. Postal Service,* 946 F.2d 189, 193 (2d Cir.1991) (citing *Bookman v. U.S.,* 453 F.2d 1263, 1265, 197 Ct.Cl. 108 (1972)). In *Bookman,* the court held that the court "will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable time period." *Id.* 453 F.2d at 1265 (citations omitted). The determination of "a short and reasonable period of time" depends on the balancing the desirability of finality in an agency's decision against the public interest in reaching a

proper result. "What is a short and reasonable period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years." *Gratehouse v. U.S.*, 512 F.2d 1104, 206 Ct.Cl. 288 (1975). In *Gratehouse,* a former government employee who had resigned from his job sought back pay and reinstatement by reason of alleged procedural errors on the part of the Civil Service Commission for failing to hear his complaint that his resignation had been coerced. The court found that the government's offer of a Civil Service Commission hearing to consider plaintiff's accusation two years later was too long a period of time to be considered a reconsideration of its earlier decision to deny plaintiff the hearing. In this case, the BATF changed its mind and revoked the previously approved COLA *three years* after the original approval. Thus, although the BATF may be able to establish implied authority to reverse its actions in some circumstances, in light of the decisions in *Bookman* and *Gratehouse* and in the absence of any showing of "unusual circumstances" by defendant that would justify the three year delay in the BATF's reconsideration, the Court finds that the BATF lacked implicit authority to revoke plaintiff's COLA in this case.

3. *Arbitrary and Capricious Action.*

■ Even if the BATF had authority to revoke the COLA, the BATF acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2). Under the APA, agency decisions may be "h[e]ld unlawful and set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2) (West 1977). The BATF's articulated reasons for revoking plaintiff's previously approved label are (1) that the label would lead consumers to falsely believe that the vodka was inherently dangerous, and (2) that by mocking the dangers of alcohol, consumers would be mislead into believing that alcohol is not dangerous.

a. *Revocation based on the belief that consumers will think "Black Death Vodka" is poisonous was arbitrary and capricious.*

The first claim by the BATF that consumers will believe plaintiffs' products are poisonous lacks a rational basis. Not only does it defy common sense to believe that the use of the term "death" in conjunction with the image of a grinning skull overcomes the otherwise clear indications on the bottle that the product contains vodka, but the two reasons put forth by the BATF for revoking the label are contradictory. The BATF claims that the "Black Death" label mocks the dangers of alcohol such that consumers will believe that alcohol is not dangerous, while also claiming that consumers will believe that the vodka is inherently unsafe for consumption. Defendants respond that the BATF's two reasons were not contradictory, but rather, the BATF meant that no matter how one viewed the label, it would create a misleading impression. Specifically, if the label was viewed facetiously, the label derided the detrimental effects of alcohol. If the label was read at face value, it would be misleading to the consumer who would think the product was inherently unfit for human consumption. When questioned at the hearing on this point, defendants conceded that consumers are not likely to believe the bottle contained a poisonous substance.

b. *Revocation based on alleged mockery of the dangers of alcohol was arbitrary and capricious.*

■ The BATF's revocation of plaintiff's label based on the alleged mockery of the dangers of alcohol was also improper. The BATF's regulations implementing the FAA Act do not authorize the BATF to generally regulate the marketing of alcoholic beverages; instead they authorize the BATF to regulate the labelling on the bottles of alcoholic beverages with respect to the content of the bottles. For the BATF to revoke a license, there must be a possibility of consumer deception as *to what is contained within the bottle itself.*

The FAA Act, 27 U.S.C.A. § 205(e) (West 1927 & Supp.1992), the basis of the BATF's authority to regulate labels of distilled spirits, was intended to prohibit practices in the alcoholic beverages industry "that Congress had judged to be unfair and deceptive, result-

ing in harm to both competitors and consumers." *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1547 (10th Cir.1991) (extensive discussion of legislative history of FAA Act as it relates to representations of alcoholic content). Based on the language of this statute, it is apparent that Congress was primarily concerned with consumer deception stemming from sellers' claims regarding the quantity and content of alcoholic beverages.[6]

The Bureau regulations implementing the FAA Act are found in Title 27 of the Code of Federal Regulations. The regulation relied on by the Bureau in this case states that

> No label shall contain any brand name, which, standing alone, or in association with other printed or graphic matter, creates any impression or inference as to the age, origin, identity, or other characteristics of the product unless the Director [of the BATF] finds that such brand name (when appropriately qualified if required) conveys no erroneous impressions as to the age, origin, identity, or other characteristics of the product.

27 C.F.R. § 5.34 (1991) [hereinafter "Section 5.34"]. Like the language of the FAA Act itself, this regulation authorizes the Bureau to evaluate brand names of alcoholic beverage products to determine whether the name is likely to mislead consumers regarding the nature of the contents of the beverage, i.e., the quality, quantity and physical characteristics *of the alcoholic beverage within the container bearing the label.*

Based on the language of the FAA Act and this regulation, the Court finds that the second reason given for revoking the label approval—that the "Black Death" label mocks the dangers of alcohol—necessarily relies on a concern which is not addressed by the FAA Act. The basic idea behind the reason asserted by the Bureau is that by parodying

the dangers of alcohol, plaintiffs deceive consumers into believing that alcohol does not have deleterious effects on a person's health. At its root, it is a concern with the marketing of "Black Death Vodka" as it relates to perceptions of the safety of alcohol in general. This understanding of the Bureau's reasoning is supported by statements made by Terry Cates in the *Wall Street Journal*, where he was quoted as saying that "[h]ad we known the direction the point-of-sale advertising was going to take, I submit we wouldn't have approved [the label]."[7] Wall Street J., Apr. 3, 1992, at B3.

On its face, Section 5.34 does not authorize the Bureau to generally regulate the *marketing* of alcoholic beverages; Section 5.34 is a *labeling* regulation. There must be a possibility of consumer deception *as to what it contained within the bottle itself* in order for the Bureau to revoke the right to use a label. This understanding of Section 5.34 is consistent with the Bureau's practice in initially approving the labels, where the Bureau decides to approve a label only if the claims regarding the contents of the distilled spirits are borne out by a chemical analysis of the spirits. *See, e.g.,* Letter from Jerry Bowerman to Ann Morse, dated July 24, 1989 (Exhibit A to Cabo Declaration) (chemical analysis of "Black Death Vodka" upon which initial label approval was based). Moreover, it is consistent with the structure of the regulations themselves: while Section 5.34 addresses statements made on product labels, an entirely different subpart of the regulations addresses the advertising of distilled spirits. *See* 27 C.F.R. subpt. H (1991) ("Advertising of Distilled Spirits").

In this case, there is no likelihood of consumer confusion as to what is contained in the bottle. The product is clearly labeled as

---

**6.** The FAA Act provides in relevant part that:

> It shall be unlawful for any person ... to sell ... any ,distilled spirits ... unless such products are ... labeled in conformity with such regulations, to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and labeling and size and fill of containers ... as will prohibit deception of the consumer *with respect to the products or quantity thereof* and as will prohibit, irrespec-

tive of falsity, such statements relating to *age, manufacturing processes, analyses, guarantees, and scientific or irrelevant matters* as the Secretary of the Treasury finds to be likely to mislead the consumer....

**7.** The Court may look beyond the administrative record in determining whether an agency considered the relevant factors in making its decision. *See Thompson v. U.S. Department of Labor*, 885 F.2d 551 (9th Cir.1989).

"vodka." Plaintiffs' Motion for Summary Judgment Brief at 8. The BATF has provided no evidence that any customer has actually believed that the bottle contains poison or anything other than vodka, nor has it presented consumer surveys indicating that the product is associated in any way with alcoholism, alcohol poisoning, drunk driving, underage drinking, or any other manifestation of alcohol abuse.

Thus, the revocation of the "Black Death" label, based on the alleged mockery of the dangers of alcohol, was improper.[8] On this record, the BATF's decision was primarily based on its concerns over the marketing of the vodka, and not on a concern that the consumers would be mislead regarding the vodka's contents. Section 5.34 does not permit the BATF to regulate labels on this basis.

c. *Revocation based on "death-evoking," misleading, or fanciful label was arbitrary and capricious.*

To the extent the BATF's revocation of the "Black Death" COLA was due to the "death-evoking," misleading or fanciful nature of the label, the decision was arbitrary and capricious. The BATF has approved such "death-evoking" labels as "Cobra" malt liquor, "Blackened Voodoo" beer, "Vampire" wine, "Razor Edge" beer, "Wicked" ale, "M.A.S.H." vodka and "Scratch" beer. Plaintiffs' Motion for Summary Judgment Brief, at 11. For the BATF to single out plaintiffs' "Black Death" vodka COLA because it somehow mocks the seriousness of alcohol or misleads young people into believing it is part of a death cult is inconsistent and unfair to plaintiffs.

In addition, non-descriptive or even fanciful tradenames are a commonplace. "Wild Turkey" bourbon, "Moosehead" beer and "Apple" computers are a few examples. The BATF itself approved the label for "Black Hat" vodka with graphics nearly identical to the graphics on the revoked "Black Death" vodka COLA. And the BATF approved a label for "Sheep Dip" scotch even though it is

highly unlikely that consumers would confuse the contents of a bottle so labeled with sheep-dip, a "liquid preparation of toxic chemicals into which sheep are plunged esp. to destroy parasitic arthropods (as lice, mites, keds, ticks)." *Webster's Third New International Dictionary* 2091 (1986).

4. *First Amendment.*

Plaintiffs argue that the BATF's revocation of the "Black Death Vodka" label violates the first amendment because the label constitutes protected speech. While the first amendment protects some commercial speech, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–62, 96 S.Ct. 1817, 1823–25, 48 L.Ed.2d 346 (1976), to the extent that the speech is false and misleading, it is not protected. *Id.* at 770–73, 96 S.Ct. at 1830–31.

■ The determination of whether the label is misleading is the same as the determination under the "arbitrary and capricious" claim above. This Court finds no evidence that the label is misleading, however, even if it were, there would be less restrictive alternatives than outright prohibition of the label. Where commercial speech has a tendency to mislead, a disclaimer rather than outright prohibition is the appropriate remedy. *Bates v. State Bar of Ariz.*, 433 U.S. 350, 375, 97 S.Ct. 2691, 2704, 53 L.Ed.2d 810 (1977). Here, the government's prohibition of the "Black Death Vodka" label strikes at the heart of the first amendment. In light of the previous analysis, however, the Court finds no reason to decide this case on first amendment grounds.

**CONCLUSIONS**

The Court has thoroughly reviewed the evidentiary submissions in this case, and in light of the foregoing analysis, the Court is satisfied that no disputed genuine issues of material fact remain. The unresolved factual disputes already described do not affect the outcome of the case, and are, therefore, not

---

**8.** As an apparent subset of the mockery thesis the BATF also asserted that the label dilutes the Surgeon General warning set forth on each bottle. The Court views this idea, that the label

somehow detracts from this clear message, to be even less persuasive than the generalized mockery of danger thesis itself.

material. Plaintiffs evidence establishes each element of the claims decided by this order, and meets the burden of the plaintiffs to demonstrate that they would be entitled to a directed verdict at trial. Defendants have failed to demonstrate a failure to state a claim upon which relief can be granted or to present evidence which, even if it is assumed to be true for purposes of this motion, would lead the Court to deny plaintiffs' motion for summary judgment.

The Court therefore ORDERS as follows:

1. Plaintiffs' motion for summary judgment is GRANTED.

2. Defendants' motion to dismiss or in the alternative for summary judgment is DENIED.

3. A status conference will be held by phone at 8:30 a.m., Pacific Standard Time, on December 9, 1992.

4. Plaintiffs are to prepare and file with the Court, within 20 days of the date of this Order, a proposed form of judgment consistent with this Order. Plaintiffs are to provide a copy of the proposed judgment to defendants and defendants may file any objections to the proposed form of judgment within 30 days of the date of this Order.

IT IS SO ORDERED.